2025 IL App (2d) 240160-U
No. 2-24-0160
Order filed October 29, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of De Kalb County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-CF-742 |
| | ) | |
| RAYMOND E. RITCHASON, | ) | Honorable |
| | ) | Marcy L. Buick, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court properly declined to instruct the jury for lesser-included offenses than the crimes with which defendant was charged. The State did not commit prosecutorial misconduct. The court did not abuse its discretion when it imposed defendant's prison sentence. We affirm defendant's convictions and sentence.

¶ 2    A jury convicted defendant, Raymond E. Ritchason, of aggravated battery with a firearm, aggravated discharge of a firearm, and unlawful possession of a weapon by a felon. The trial court imposed a prison sentence of 10 years for aggravated battery with a firearm, which was merged with his conviction for aggravated discharge of a firearm for sentencing purposes, and 5 years for unlawful possession of a weapon by a felon, to be served concurrently. On appeal, defendant

argues: (1) the court erred by failing to give a jury instruction for a lesser-included offense; (2) the State committed prosecutorial misconduct; and (3) he received an excessive sentence. For the following reasons, we affirm.

¶ 3        I. BACKGROUND

¶ 4        On December 17, 2020, defendant shot Zane Collins in the hand with a .44 caliber revolver, causing Collins to lose a finger. The State initially charged defendant by complaint with one count of aggravated battery with a firearm (ABF) (720 ILCS 5/12-3.05(e)(1), (h) (West 2020)), a class X felony, one count of aggravated discharge of a firearm (ADF) (720 ILCS 5/24-1.2(a)(2), (b) (West 2020)), also a class X felony, one count of unlawful use/possession of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a), (d) (West 2020)), a class 3 felony, and one count of reckless discharge of a firearm (720 ILCS 5/24-1.5(a), (c) (West 2020)), a class 4 felony.[1] Defendant later was indicted by grand jury on each of the same charges alleged in the complaint. Pertinent to this appeal, count I, charging ABF, alleged that defendant "knowingly discharged a firearm and thereby caused bodily harm to Zane Collins in that Collins sustained a gunshot wound to his hand." Count II alleged ADF in that "defendant did knowingly discharge a firearm in the direction of another."

---

[1]Before trial, the State sought leave to modify count II of the complaint alleging ADF to strike the language stating, "defendant was within 1,000 feet of Northern Illinois University campus." The trial court granted the State leave, thereby changing the sentencing parameters from a Class X felony to a Class 1 felony. 720 ILCS 5/24-1.2(b) (West 2020). In addition, the State nol-prossed count IV, alleging reckless discharge of a firearm.

¶ 5                                    A. Pretrial

¶ 6     On July 18, 2023, defendant filed a motion *in limine* to prohibit the State from introducing evidence of his prior felony convictions for domestic battery in 2018, possession of a controlled substance in 2019, and violation of an order of protection in 2020. The State moved *in limine* to introduce evidence of defendant's criminal history the following day. At the hearing on these motions, the State argued that all of defendant's felony convictions were within the guidelines set forth in *People v. Montgomery*, 47 Ill. 2d 510 (1971), and not remote in time. Defendant responded that his prior felony convictions should not be admitted because they are unfairly prejudicial and not probative in value. The trial court found that the felony convictions for possession of a controlled substance and the violation of an order of protection had indicia of defendant's credibility as a witness and were, therefore, admissible at trial. The court concluded that the probative value of the two felony convictions outweighed any prejudicial impact. Thereafter, the parties stipulated that defendant "has previously been convicted of a felony offense for purposes of the convicted felon status element of Unlawful Possession of a Firearm by a Felon."

¶ 7                                    B. Trial

¶ 8     Zane Collins testified that on December 17, 2020, he was living in an apartment in DeKalb with his girlfriend, Jessica Ritchason, who is the sister of defendant. Collins identified defendant in open court. Collins had invited defendant to come live with them in his apartment.

¶ 9     Collins described a gathering in his living room the evening of December 17, which included defendant, Carlee Lauderdale, and Randy Baird. They listened to music, played games, drank, and joked around. Collins stated that he was using his cell phone for a video chat with his brothers. Everyone in the living room joined in for the video call, which Collins described as "loud and clear." Collins held his cell phone so that defendant could see and hear the video chat. Collins

stated that at first, he made a joke about his brother "having a Hi-Point gun." At that point, defendant showed his gun and "we all joked about [defendant's] gun."

¶ 10    The State asked Collins whether he knew defendant had a gun and Collins responded, "no." Collins would not have allowed defendant to bring a gun into his apartment because Collins was a convicted felon and not allowed to be in the presence of a gun. When defendant went to the bathroom, Collins tried to hide defendant's gun under the couch. Collins eventually gave the gun back to defendant because "I knew we [were] all drinking and I didn't want nothing to happen like that, and I think he was just showing off really." Collins stated that defendant waved the gun around to show it off to Collins's brothers on the video chat.

¶ 11    Collins continued that everyone "was all joking having a good time. By that time I guess he—he didn't like the joke, so he said he will shoot through the phone." Collins stated that defendant "was kind of angry because we [were] joking around." Collins testified that he did not take defendant's threat seriously because he had invited defendant to live with him, gave him clothes, rides to work, and money. Collins stated, "I didn't think he really would shoot through the phone honestly," after which Collins demonstrated to the jury how, at the time of the incident, he was holding the cell phone in his right hand with his arm somewhat extended, but still parallel with and close to his head.

¶ 12    Collins then testified that defendant shot through the phone while Collins held the phone in his hand. He stated that he did not realize he had been shot until he looked at Lauderdale's reaction. Collins continued, "I didn't even remember nothing really, but I just remember them cleaning up." He recalled defendant and Baird cleaning up the blood. No one called for emergency services. Eventually, Collins looked down at his hand and realized that his finger "was blown off" and "hanging from a piece of skin." He wrapped up his hand and asked if anyone could take him

to the hospital. Defendant did not ask Collins if he was okay. Baird and Lauderdale drove Collins to the hospital. Collins stated that his cell phone had a bullet hole through it.

¶ 13    When Collins arrived at the hospital, he told the staff treating him that he was shot but did not provide any details regarding what had occurred. He stated that he also was unable to tell police officers who had arrived at the hospital what had happened because "it was so much to take in I could not talk." Collins lost his right index finger and described how he suffers from pain every day and is unable to work at his former factory job. He then answered questions regarding State's exhibits, including photographs depicting how the living room and his cell phone appeared after the shooting. The picture of the cell phone depicted a bullet hole through the screen. Another picture depicted a shirt used to clean up the blood following the incident. The photographs were admitted into evidence and published to the jury without objection.

¶ 14    On cross-examination, Collins explained that defendant had been staying with him for a few months and that he treated defendant "like my little brother." Prior to the incident, Collins and defendant had a good relationship. For the majority of December 17, 2020, defendant and Collins were together in Collins's apartment and were later joined by Baird and Lauderdale at about 6 p.m. Collins and defendant began drinking whiskey at about noon that day. Once Baird and Lauderdale arrived, they began drinking as well.

¶ 15    Collins described how, at one point during the evening, defendant pulled out a gun and waved it around. Collins tried to take the gun away from defendant. He hid the gun after defendant went to the bathroom. When defendant returned, he said that he wanted his gun to be given back to him. Defendant tried to find the gun and after about two minutes elapsed, Collins gave it back to him. Collins stated that after he returned it, defendant cleaned the gun.

¶ 16    When Collins spoke to his brothers during the video call, he was holding up his cell phone and standing up but leaning on the edge of a couch. Defendant was standing one or two feet away from Collins. When asked to describe how defendant held the gun when he fired it, Collins stated, "[Defendant] said he would shoot through the phone. He cocked the hammer back. I didn't think he was really gonna shoot through the phone." Collins explained that when defendant shot him, defendant was even closer than two feet away "because he was right next to me." Collins agreed that "the phone might have been within six inches of the gun." Collins described that defendant aimed the gun "[a]t me." When defense counsel next asked whether defendant was aiming the gun at Collins or the phone, Collins responded, "I'm holding the phone *** it's the same thing." Defendant's arm was fully extended when he fired the gun. Collins acknowledged that defendant did not say he was going to shoot him and again stated "[defendant] said he would shoot through the phone." Defendant did not point the gun at any other part of Collins' body. Collins testified that he believed defendant shot him on purpose. Collins also agreed that defendant could have shot him anywhere else on his person. Before defendant shot him, defendant did not exhibit any anger towards Collins or threaten Collins other than saying he was going to shoot through the phone.

¶ 17    Baird testified that on December 17, 2020, he and Lauderdale arrived at Collins's apartment in the early evening to "hang out." Defendant is Baird's uncle and he invited Baird to come over to Collins's apartment. Baird described how everyone was drinking and listening to music. Baird saw defendant cleaning a gun. He stated that at the time of the shooting, "[e]veryone was already very drunk and they were nagging on [defendant] about a gun being fake." Baird clarified that Collins's brothers were making fun of defendant's gun during a video call. Baird testified that defendant became angry when they made fun of his gun and then the "[g]un went off." Defendant was holding the gun when it was fired. Collins was holding up his cell phone so

defendant would be able to see the people who were talking to him. Baird described the gun as a six-shot revolver. He did not recall whether defendant said anything to Collins prior to firing the gun because he was watching television and not paying attention to the video chat. Baird stated that defendant had fired the gun once. Baird and Lauderdale took Collins to the hospital after he was shot.

¶ 18    After Baird dropped off Collins at the hospital, he returned to Collins's apartment. Defendant asked Baird to take Collins's cell phone and a backpack with the gun that had just been used to shoot Collins. When the State asked Baird why he had agreed to take the cell phone and the gun, he responded "[f]amily's family at the end of the day." Baird put the backpack in the trunk of his car.

¶ 19    Later that night, police arrived at his house and asked if he had been present when Collins was shot. Initially, Baird told the police that he had been in the bathroom at the time of the shooting but later acknowledged that defendant had shot Collins. Baird led the police to the gun in the trunk of his car but did not know what had happened to Collins's cell phone. Baird identified the photograph of defendant's gun and testified that it was the gun used to shoot Collins. He also identified a photograph of the backpack defendant gave him to transport the gun. Finally, he identified a photograph depicting Collins's cell phone with a bullet hole in it and stated that the picture accurately showed how the phone appeared on the night of the shooting. All the photographs were admitted into evidence without objection and published to the jury.

¶ 20    On cross-examination, Baird testified that he did not observe any altercation between defendant and Collins prior to the shooting. Baird stated that defendant did not get angry at Collins for hiding his gun. Defendant sat next to Collins on the couch, took apart the gun, cleaned it, and reassembled it. According to Baird, defendant was standing about five feet away from Collins

when he shot him. Defendant pointed the gun towards Collins's cell phone. Baird saw defendant shoot Collins. Baird acknowledged that he did not initially tell police the truth about whether he witnessed the shooting and that he possessed the gun in the trunk of his car. Eventually, he told police that he had the gun in the trunk of his car. Baird told the police he did not believe defendant shot Collins on purpose.

¶ 21 On redirect examination, Baird acknowledged that Collins's brothers were making fun of defendant's gun. Baird agreed that defendant became angry and immediately thereafter fired the gun at the cell phone Collins was holding in his hand.

¶ 22 Lauderdale testified that she is a friend of defendant. On December 17, 2020, she and Baird went to Collins's apartment at defendant's invitation. Lauderdale did not know Collins. Everyone was drinking and enjoying themselves. Lauderdale stated that Collins was on a video call. At the time, defendant "was playing with a handgun," that Lauderdale described as "[a] cowboy gun." She recalled that defendant was "[p]ointing it, unloading it, reloading it, wiping it down; just being irresponsible." At one point, Collins hid the gun under a couch cushion. Later, defendant once again had the gun and "people on the [video] call or whatever were talking crap about the gun," which made defendant angry. In response, defendant stated that "he was going to shoot the phone." Immediately thereafter, Lauderdale "looked away and then my hearing went out and then I heard a bang, and I looked over and [defendant] was standing up pointing the gun at the ceiling." She observed smoke emanating from the gun. She heard Collins yelling, looked over, and saw his finger "basically dangling by the skin." She and Baird took Collins to the hospital. After dropping off Collins, she and Baird returned to Collins's apartment. She observed defendant put the gun in a backpack and asked them to "get rid of it." Lauderdale stated that she did not want to take the

gun, but defendant "was suicidal after the shooting, so we didn't think it was a good idea to leave it with him."

¶ 23    The State then presented Lauderdale with exhibits depicting photographs of defendant's gun, which she identified as the firearm used to shoot Collins. She also identified a photograph of a bloody shirt that was used to clean Collins's blood following the incident. She stated that the photographs accurately depicted both the gun and bloody shirt as they appeared on the night of the incident.

¶ 24    On cross-examination, Lauderdale further described how defendant was playing with the gun and pointing it intermittently at Collins and Baird. She stated that she felt unsafe while defendant played with the gun. Lauderdale agreed that she did not see defendant aim or point the gun at Collins. She stated that after defendant shot Collins, defendant "was really regretful and apologizing and he said he didn't want to be alive." According to Lauderdale, defendant apologized to Collins.

¶ 25    Sergeant Ray Hernandez of the DeKalb Police Department testified that at approximately 8:47 p.m. on December 17, 2020, he received a call from Kishwaukee Hospital regarding a patient with a gunshot wound. He was the on-call detective working that night. Sergeant Hernandez stated that DeKalb police officer Fleury was dispatched to the hospital. Officer Fleury attempted to speak with Collins. He collected Collins's clothing from the hospital and brought it back to the police department.

¶ 26    Sergeant Hernandez spoke to Collins's live-in girlfriend, Jessica Ritchason, that night and requested her consent to search Collins's apartment. She provided consent and Sergeant Hernandez arrived at the apartment for further investigation. She unlocked the door and granted entry. After

Sergeant Hernandez entered the apartment, he found defendant sleeping on the couch. Defendant stipulated to Sergeant Hernandez's in-court identification.

¶ 27 After Sergeant Hernandez woke up defendant, police officers transported defendant to the police station. Sergeant Hernandez began to process the scene and collect evidence, which included blood near the front door of the apartment and a disfigured metal object consistent with a projectile from a gun and other metal fragments in a trash can. In the couch, he located what appeared to be a grazed piece of fabric, along with a chipped piece of the floor. He used trajectory rods to determine a path for the bullet that had been fired. Sergeant Hernandez stated that the tears in the couch were consistent with a bullet. He also found defendant's wallet. In the bathroom, Sergeant Hernandez located a shirt with an unknown red substance that had been put in a trash can.

¶ 28 At the police station, Sergeant Hernandez conducted a gunshot residue test that defendant agreed to complete. Next, Sergeant Hernandez located Baird at his home and Baird led him to the trunk of his car, which had a black backpack containing a .44 Magnum revolver allegedly used to shoot Collins. Sergeant Hernandez described the gun as a six-cylinder firearm. He recovered the gun, took it back to the police station, and processed it for further laboratory investigation. He also interviewed Lauderdale and then proceeded to the hospital to speak to Collins. Sergeant Hernandez described Collins as not very responsive or forthright about what had happened.

¶ 29 Sergeant Hernandez secured an arrest warrant for defendant on February 4, 2021. The State presented Sergeant Hernandez with its exhibits of photographs for identification depicting, among other things, the gun that was recovered from Baird, the couch at Collins's apartment, the metal fragments recovered from the trash can, and the shirt collected from Collins at the hospital following the incident. In addition, Sergeant Hernandez testified regarding a photograph depicting

the suspect revolver with five hollow-point rounds and one spent shell casing. Sergeant Hernandez explained at length how hollow-point bullets are more devastating to soft tissue than a standard, traditional "full metal jacket" bullet. The photographs were each presented, identified, published to the jury, and admitted into evidence without objection. Sergeant Hernandez also testified at length regarding chain of custody and laboratory testing for the evidence collected.

¶ 30    Next, Sergeant Hernandez testified regarding the .44 Magnum revolver used in the shooting. He explained that to shoot the gun, "it's a single action revolver," which is "always going to be a two-step process, different from, say, a Glock or the duty weapon that I carry." The revolver requires a person "to cock back or pull on this hammer *** in order to squeeze the trigger." First, cocking the firing pin "indicates one's intent to shoot or readies the gun to fire." Sergeant Hernandez stated that the second step involves squeezing the trigger. He explained that "[t]he hammer would go back and one would have to cock it back again prior to squeezing the trigger." The State then admitted additional physical evidence without objection.

¶ 31    On cross-examination, Sergeant Hernandez testified that he did not recover Collins's cell phone from Baird and Baird did not tell him where the phone was located. Defendant cooperated with the police investigation of the shooting.

¶ 32    Illinois State Police forensic scientist Kim Gruenstein testified as an expert witness regarding her analysis of the gunshot residue for this case. She concluded that defendant may not have discharged a firearm with either hand and that, if he did, then the gunshot residue was not deposited, removed by other activity, or not detected by the testing procedure. She stated that an individual can remove gunshot residue by something as inconsequential as shaking another person's hand. Gruenstein explained that if a person fires a handgun, the time limitation for

collection of gun residue is six hours and, if the residue is not collected within that time frame, that could be a factor in not obtaining a positive result.

¶ 33    Illinois State Police forensic scientist Christina Davison testified as an expert witness in the field of firearms identification. She explained the differences between a revolver and a semi-automatic pistol. Davison described how a revolver requires a two-step process for firing in that the hammer must be manually pulled back and then the trigger releases the hammer. Davison explained that a revolver is known as a "single-action firearm" because "the trigger only does one single action." She examined evidence from the incident, including the .44 Magnum revolver and the casing from the spent chamber. Davison determined that the spent cartridge case was fired from the revolver the police had recovered in this incident. During cross-examination, Davison further explained that the only way to "decock the hammer" is by pulling the revolver's trigger.

¶ 34    After Davison's testimony, the State read a stipulation to the jury that defendant "has previously been convicted of a felony offense for the purposes of the convicted felon status element of unlawful possession of a firearm by a felon. So stipulated." The stipulation was then admitted into evidence.

¶ 35    Next, the State rested, and defendant moved for a directed finding, arguing that the State had failed to present evidence of intent required to establish that he knowingly committed ABF and ADF. Specifically, he contended that the evidence failed to show that he fired the gun with the knowledge that he was going to strike Collins. The trial court denied defendant's motion, finding the State's evidence "could support a verdict of guilty on both counts." Defendant chose not to testify in his defense and rested without presenting evidence.

¶ 36    At the jury instructions conference, defendant submitted instructions for the two lesser-included offenses of reckless discharge of a firearm and reckless conduct because the State failed

to present evidence specifically showing that he said he was going to shoot Collins. According to defendant, there was conflicting and inconsistent testimony regarding his mental state at the time of his shooting and, therefore, jury instructions reflecting "recklessness" were appropriate for submission to the jury. The State responded that there was no direct evidence demonstrating that defendant did not intend to discharge the revolver and, instead, he had announced his intention to shoot through the cell phone that Collins had been holding in his hand.

¶ 37 During argument, the trial court asked defense counsel what facts would allow the jury to find that defendant had acted in a reckless manner. Defense counsel responded that defendant had been waving the gun around and pointing it at people. Defendant had been drinking and had repeatedly kept cocking and uncocking the revolver. Defense counsel argued that those facts, when combined together, could allow the jury to make the decision that he was reckless when he fired the gun. In addition, defense counsel pointed to Lauderdale's testimony that defendant had apologized to Collins after the incident and stayed in the apartment afterwards as evidence of that he did not act intentionally.

¶ 38 Following argument, the trial court found that reckless conduct and reckless discharge of a firearm can be considered lesser-included offenses to the charges in this case. However, the court then ruled, "[l]ooking at the facts that have been heard by the jury in this case, there is no evidence presented that the defendant did not know that the victim Zane Collins was holding the phone." According to the court, no evidence was presented showing that the cell phone had been propped up against something else. The court stated, "[t]he shot was fired at the phone. [Collins] was holding the phone." The court concluded:

"It is the Court's view of the evidence that the jury heard in this case that when analyzing the moment that counts, and that's when the defendant pulled the trigger,

that a jury could not rationally find the defendant guilty of a lesser offense of reckless conduct or reckless discharge of a firearm, and the Court's ruling is that the defendant's proposed instructions for reckless conduct and reckless discharge of firearm are denied."

¶ 39 Next, the trial court and parties discussed the submission of Illinois Pattern Jury Instruction (IPI) 18.07 (approved December 8, 2011) (IPI) for the commission of the offense of UUWF. Defendant agreed to include in a separate instruction, labeled as IPI 18.08, that the parties had stipulated defendant had been convicted of a felony and that the jury "can consider the convicted felon status element of this offense as proved by a stipulation."

¶ 40 Following closing argument, the jury found defendant guilty of ABF, ADF, and UUWF. Defendant filed a motion for new trial, arguing, among other things, that the trial court erred when it denied his request to instruct the jury on the lesser-included offenses of reckless conduct and reckless discharge of a firearm.

¶ 41 At the sentencing hearing, the State argued that defendant should receive a substantial sentence due to the serious nature of his offenses and his prior criminal history as a four-time convicted felon. The State pointed to the escalation of the crimes he committed and that he was remorseful now because of the potentially serious punishment to be imposed. The State also maintained that defendant took no responsibility for shooting Collins and instead made self-serving excuses. According to the State, the imposition of any sentence less than 15 years would be an insult to Collins and would not properly reflect the crimes defendant committed. In mitigation, defendant noted his lengthy history of substance abuse and his efforts towards rehabilitation, including that he had maintained sobriety since his release on bond nearly two years earlier, passing all 89 of his drug tests during that time. Defendant argued that the evidence

presented at trial did not show that he contemplated his conduct would cause serious physical harm to Collins.

¶ 42    Defendant testified in allocution that he was raised in a difficult environment that led to his substance abuse issues. He stated that, on the day of the incident, he had been drinking with Collins the entire day and that he had been "extremely drunk" when he pulled out his gun, played with it, and passed it around. He stated, "I was so drunk I couldn't remember if it was cocked or not." He continued to play with the gun "and as I'm waving it around, it went off." He claimed that it was his reckless and foolish behavior, "along with my extreme alcohol addiction that led to someone so close to me losing a finger." Defendant stated that since the incident, he "completely turned [his] life around for [his] kids" and himself.

¶ 43    The trial court took the parties' arguments and evidence presented in aggravation and mitigation under advisement and imposed its sentence on December 12, 2023. The court considered the statutory factors in mitigation and found that "there are no applicable statutory factors in mitigation." As to the statutory factors in aggravation, the court found that defendant's conduct caused or threatened serious bodily harm in that defendant shot a gun directly at Collins's hand. The court also noted defendant's history of delinquency and criminal activity, including domestic battery and resisting a peace officer. Further, defendant did not comply with the court's sentence imposed for those convictions. He also did not comply with the sentence imposed in a later felony domestic battery conviction and required resentencing. Defendant again did not comply with his probation for unlawful possession of a controlled substance and re-offended while on that probation. Finally, the court stated that defendant committed the offense in this case while serving a sentence of conditional discharge for a felony violation of an order of protection.

¶ 44    When imposing its sentence, the trial court stated that "there are many things wrong with the defendant's version of events that led to his conviction in this case, not the least of which is that *** [he] purposefully as a convicted felon purchased a gun in violation of the law and of his sentence of probation." In addition, the court found defendant "apparently has given no serious thought to the life-altering damage he inflicted on [Collins]," when defendant stated in allocution that Collins had lost a finger while defendant had lost a friend. The court considered the trial evidence, the record in this case, the presentence report, the history, character, and attitude of defendant, the evidence and arguments of counsel at sentencing, the statement in allocution, and the statutory factors in aggravation and mitigation. The court sentenced defendant to 10 years' imprisonment to be served at 85% with a three-year mandatory supervised release for ABF, which merged with the count II conviction of ADF. In addition, the court imposed a five-year sentence for the conviction of UUWF, to be served concurrently with the 10-year sentence.

¶ 45    Following sentencing, defendant moved to reconsider and reduce his sentence. The trial court heard argument on that motion and the motion for new trial. The court denied both of defendants' motions, finding that the sentence imposed was reasonable considering the evidence presented and the statutory sentencing range. This appeal followed.

¶ 46                                    II. ANALYSIS

¶ 47    On appeal, defendant argues that the trial court erred when it failed to give the jury a lesser-included offense instruction for reckless conduct as the corresponding lesser-included offense for both ABF and ADF. Defendant also contends that the State committed prosecutorial misconduct by using his convicted felon status as evidence of his dangerousness, as well as trying to inflame the jury's passions by generating sympathy for Collins. Finally, he argues that his sentence was excessive.

¶ 48    Before addressing the merits of this appeal, although the State did not directly raise this issue, we note that defendant's opening brief violates Illinois Supreme Court Rules 342(a)(1) and (3) (Ill. S. Ct. R. 342(a)(1), (3)) (eff. Oct. 1, 2019)), which require an appellant's brief to include "an appendix [and] a complete table of contents, with page references, of the record on appeal." Defendant's "table of contents" to the record on appeal in his appendix is merely a copy of the table of contents from the trial court's records, which were not in chronological order and in no way provided this court with the necessary means to navigate the record. It appears as a courtesy, defendant included an "index to the record" of the table of contents for the witnesses who testified at the jury trial. However, considering that defendant here is contesting the jury instructions, opening statement, closing arguments, rebuttal, and sentencing, providing this court with a proper table of contents allowing an appropriate review of such issues is imperative. Under our supreme court rules, defendant was required to include a table of contents to the record that stated the nature of each document, order, or exhibit, and the dates of filing or entry of orders. Instead, defendant's table of contents to the record on appeal provided no detail whatsoever as to the nature of each document, order, exhibit, or pertinent testimony and argument of defendant's motions.

¶ 49    Supreme court rules are not merely suggestions but are necessary for the proper and efficient administration of the courts. *In re Marriage of Kiferbaum*, 2014 IL App (1st) 130736, ¶ 20. When a brief fails to follow the requirements set forth in the supreme court rules, we may dismiss the appeal. *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 21; *Fender v. Town of Cicero*, 347 Ill. App. 3d 46, 51 (2004). We recognize, however, that striking a brief or dismissing an appeal is a particularly harsh sanction. *People v. Thomas*, 364 Ill. App. 3d 91, 97 (2006) (citing *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005)). Although defendant's deficient brief frustrates our review, we will consider the merits of the appeal. We

admonish the Office of the State Appellate Defender to adhere to the requirements of the supreme court rules in future appeals.

¶ 50                          A. Lesser-Included Offense Jury Instruction

¶ 51     Defendant first argues that the trial court erred when it refused his request for a jury instruction on the lesser-included offense of reckless conduct.[2] He contends that the record contains substantial evidence demonstrating that he did not intend to shoot and injure Collins but rather acted recklessly while in an intoxicated state.

¶ 52     Our supreme court has held that "[a] defendant generally may not be convicted of an offense for which the defendant has not been charged." *People v. Ceja*, 204 Ill. 2d 332, 359 (2003). In an appropriate case, however, "the defendant is entitled to have the jury instructed on less serious offenses that are included in the charged offense." *Id*. An instruction for a lesser-included offense provides the jury with an option that, if they believe the defendant is guilty of a crime but uncertain whether the charged offense has been proved, "the jury might convict the defendant of the lesser offense rather than convict or acquit the defendant of the greater offense." *Id*.

¶ 53     Recently, the supreme court reaffirmed the use of a two-part test, known as the charging instrument approach, to determine whether a defendant is entitled to a jury instruction on a lesser-included offense. See *People v. McDonald*, 2016 IL 118882, ¶ 25. First, the trial court must determine whether the charging instrument described the lesser offense. *Ceja*, 204 Ill. 2d at 360. "At a minimum, the instrument charging the greater offense must contain a broad foundation or main outline of the lesser offense." *Id*. " 'Second, if the charging instrument identifies a lesser-

---

[2]Although defendant at trial sought lesser-included offense jury instructions for both reckless conduct and reckless discharge of a firearm, his argument on appeal is limited to the refusal to instruct the jury on reckless conduct.

included offense, evidence adduced at trial must rationally support the conviction on the lesser-included offense.' " *Id*. (quoting *People v. Baldwin*, 199 Ill. 2d 1, 6 (2002)). That is, the court must determine "whether there is *some* evidence in the record that, if believed by the jury, will reduce the crime charged to a lesser offense, not whether there is *some credible* evidence." (Emphasis in original.) *McDonald*, 2016 IL 118882, ¶ 25. "A court must examine the evidence presented and determine whether the evidence would permit a jury to rationally find the defendant guilty of the lesser-included offense, but acquit the defendant of the greater offense." *Id*. Further, whether the facts alleged in the charging instrument set forth a broad foundation or main outline of the lesser-included offense is a separate inquiry from whether the facts adduced at trial supported a conviction on the lesser-included charge. *Id*. Our supreme court noted that we must "cautiously avoid" eroding the charging instrument approach or converting it into something else. *Id*. at 361.

¶ 54     The standard of review of a trial court's decision to not give a lesser-included offense jury instruction is abuse of discretion. *McDonald*, 2016 IL 118882, ¶ 42. An abuse of discretion occurs when the trial court's decision is "arbitrary, fanciful, or unreasonable," or when "no reasonable person would agree with the position adopted by the trial court." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). We now apply the two-tiered charging instrument approach test to consider whether the trial court abused its discretion.

¶ 55                    1. Reckless Conduct as a Lesser-Included Offense

¶ 56     We first determine whether reckless conduct is a lesser-included offense for the charged offenses of ABF and ADF. In this case, the charging instrument for both alleged crimes must contain a broad foundation or main outline of reckless conduct.

¶ 57   In *People v. Matias*, 2023 IL App (2d) 220445-U, ¶ 46,[3] this court recently found that reckless conduct was a lesser-included offense based on the charging instrument's description of ABF. The indictment in *Matias* charged that the defendant "knowingly discharged a firearm and caused injury to [the victims]" as the defendant fired four shots after being involved in a fist fight at a bar. *Id*. ¶¶ 10, 40, 46. Video footage at trial showed that, while the defendant fired the first two shots into the air, he then lowered the gun to chest level and fired two more shots in the direction of the victims. *Id*. ¶¶ 10-11. This court noted that the "[t]he offense of reckless conduct occurs when a person recklessly performs an act that causes bodily harm to or endangers the safety of another person." *Id*. ¶ 46 (citing 720 ILCS 5/12-5(a)(1) (West 2016)). The court stated that the only difference between the charged offense and the offense of reckless conduct is the defendant's mental state and emphasized that "recklessness can be inferred from the more culpable mental state of knowledge." *Id*. (citing *People v. Lane*, 2017 IL App (1st) 151988, ¶ 15). As such, the court found that the charge of ABF broadly defined reckless conduct, making it a lesser-included offense for purposes of the charging approach test. *Id*. ¶ 40.

¶ 58   In *People v. Williams,* this court determined that reckless conduct was a lesser-included offense of ADF. 293 Ill. App. 3d 276, 281 (1997). The defendant was initially charged with ADF, among other charges, after a confrontation at an apartment complex led to the defendant firing his gun six times into the air with his eyes closed, ultimately striking and killing another person. *Id*. at 278. At trial, the court refused the defendant's proposed jury instruction for the lesser-included offense of reckless conduct. *Id*. at 280. The counts charging the defendant with ADF stated, in

---

[3]Illinois Supreme Court Rule 23(b) provides that "a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes." Ill. S. Ct. R. 23 (eff. Feb. 1, 2023).

part, that the "defendant[] knowingly discharged a pistol in the direction of" the victim. *Id*. In contrast, reckless conduct is committed if a person recklessly performs an act which causes bodily harm to, or endangers the bodily safety of, an individual by any means, regardless of whether the act was lawful or unlawful. *Id*. at 281 (citing 720 ILCS 5/12-5(a) (West 1994)). The court found that the act of discharging a pistol in the direction of an individual is a reckless act that would endanger the safety of that individual. *Id*. According to the court, the only change from the initial charge necessary to establish the offense of reckless conduct "would be to replace the mental state of knowledge with the less culpable mental state of recklessness." *Id*. As a result, the court concluded that reckless conduct was a lesser-included offense of ADF. *Id*.

¶ 59    Similar to the defendants in *Matias* and *Williams*, defendant here is charged with ABF in that he "knowingly discharged a firearm and [caused] injury to [the victim], to wit: defendant discharged a firearm at [the victim], who sustained a gunshot wound to his hand," and aggravated discharge of a firearm in that he did "knowingly discharge a firearm in the direction of another." See 720 ILCS 5/12-3.05(e)(1) (West 2020); 720 ILCS 5/24-1.2(a)(2) (West 2020). The question, then, is whether the charging instruments contain at least a broad foundation, or main outline, of reckless conduct.

¶ 60    In this case, the charges against defendant are nearly identical to those alleged in *Matias* and *Williams*, respectively. Reckless conduct occurs when a person "by any means lawful or unlawful, recklessly performs an act or acts that: (1) cause bodily harm to or endanger the safety of another person; or (2) cause great bodily harm or permanent disability or disfigurement to another person." 720 ILCS 5/12-5(a) (West 2020). "A person *** acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross

deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2020). Our supreme court has held that "[t]he discharge of a firearm is reckless when the act creates a substantial and unjustifiable risk to others." *People v. Giraud*, 2012 IL 113116, ¶ 21. Accordingly, reckless conduct focuses on a person's reckless mental state and an act or acts that cause bodily injury or endanger another person's safety. See 720 ILCS 5/12-5(a) (West 2020). It follows that the only notable difference between reckless conduct and the charges of ABF and ADF is defendant's mental culpability, which is lesser for reckless conduct. Therefore, we find that reckless conduct is a lesser-included offense of both ABF and ADF for purposes of establishing the first prong of the charging instrument approach. *Ceja*, 204 Ill. 2d at 360-61; *Williams*, 293 Ill. App. 3d at 281; *Matias*, 2023 IL App (2d) 220445-U, ¶ 46 (finding that "[a]n allegation of recklessness can be inferred from the more culpable mental state of knowledge").

¶ 61        2. Whether Evidence Supported a Lesser-Included Instruction

¶ 62    Our determination that reckless conduct is a lesser-included offense of ABF and ADF does not end the inquiry. *People v. Hamilton*, 179 Ill. 2d 319, 324 (1997). Here, defendant would be entitled to a lesser-included offense instruction on reckless conduct only if the evidence presented at trial could rationally support a finding that defendant was guilty of reckless conduct but innocent of ABF and ADF. *Ceja*, 204 Ill. 2d at 360; *People v. Jones*, 175 Ill. 2d 126, 135 (1997).

¶ 63    In *Matias*, this court found that the defendant was not entitled to a jury instruction for reckless conduct because no jury could have rationally found the defendant guilty of reckless conduct but acquit on the charge of ABF. 2023 IL App (2d) 220445-U, ¶ 48. The defendant claimed ineffective assistance of counsel for "failing to request an instruction on reckless conduct as a lesser included offense of aggravated battery with a firearm" during trial. *Id.* ¶ 43. The court determined that while reckless conduct did constitute a lesser-included offense for the charge of

ABF, the defendant nonetheless was not entitled to a jury instruction on the lesser-included offense. *Id*. ¶ 48. In so finding, the court reasoned that there was clear video evidence that the "defendant *knowingly* fired numerous shots in the direction of individuals and struck two of them." (Emphasis added.) *Id*. The court found no factual basis for instructing the jury on recklessness. *Id*. ¶ 49. Therefore, no jury could have rationally found the defendant guilty of reckless conduct but acquit on the charge of ABF. *Id*. ¶ 48.

¶ 64    *Williams*, on the other hand, determined that the defendant was entitled to a jury instruction on reckless conduct as a lesser-included offense of ADF due to conflicting testimony as to the mental state of the defendant. 293 Ill.App.3d at 281-82. The defendant testified that, when firing the gun, his eyes were closed and he fired into the air to scare the victim away. *Id*. at 282. Additionally, the defendant did not admit that he knowingly fired the gun at other people. *Id*. The court concluded that, based on the record, the jury should have been instructed on reckless conduct. *Id*. In so holding, this court reasoned that there was some evidence from which the jury could have inferred that the defendant was guilty of reckless conduct but not guilty of ADF. *Id*.

¶ 65    Pertinent here, the Illinois Criminal Code of 2012 (Code) states that a person acts knowingly if: (1) "[t]he nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist"; or (2) "[t]he result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that the result is practically certain to be caused by his conduct." 720 ILCS 5/4-5 (West 2020). A person commits ABF when, "in committing a battery, he or she knowingly *** [d]ischarges a firearm *** and causes injury to another person." *Id*. § 12-3.05(e)(1). A person commits ADF when he knowingly "[d]ischarges a firearm in the direction of another person." *Id*. § 24-1.2(a)(2).

¶ 66    In this case, even though we found that reckless conduct is a lesser-included offense for both ABF and ADF, we conclude that the trial court did not abuse its discretion in refusing to instruct the jury on the lesser-included offense. Based on the evidence adduced at trial, no jury could have found defendant guilty of reckless conduct but not guilty of ABF or ADF. Like the defendant in *Matias*, who was found to have deliberately fired a gun in the direction of other people even though he testified that he never knowingly fired the gun at another person, the record here reveals that defendant knew that he was firing a gun in the direction of another person, rather than firing randomly or indiscriminately. Witness testimony indicated that defendant was showing off his gun when Collins's brothers began making fun of it via the cell phone video chat. Multiple witnesses recalled that defendant became angry and stated that he was going to shoot through the phone, which was openly and visibly being held by Collins. Indeed, Collins testified that at the time of the shooting he was holding his phone up to his right ear so that defendant could see and hear the video call. Then, defendant aimed the gun at the phone and shot through the phone like he said he was going to do, ultimately firing through Collins's finger.

¶ 67    Further, expert testimony established that the revolver used in the shooting required a two-step process before a bullet could be fired, mitigating the chance that the gun could be fired "recklessly" or without intent. *Id*. § 4-6. A firearms identification expert testified that the .44 Magnum revolver used by defendant cannot accidentally be set off in one motion – the user must first "cock the hammer," before pulling the trigger to fire a bullet. Thus, after defendant had stated that he was going to shoot through the phone, he first was required to cock the hammer and then subsequently pull the trigger to shoot through the phone, which he knew Collins was holding. In short, the evidence showed defendant knowingly chose to cock the hammer and pull the trigger while he pointed the gun directly at the phone Collins was holding, causing injury to Collins. The

evidence presented at trial established that defendant knowingly discharged a gun that caused injury to another person (*id*. § 12-3.05(e)(1)) and knowingly discharged a firearm in the direction of another person (*id*. § 24-1.2(a)(2)). Defendant's conduct was intentional and not reckless.

¶ 68    Defendant's argument that he did not intend to shoot Collins because he was merely aiming at the cell phone is simply unpersuasive and at odds with the evidence. Collins testified defendant stood one or two feet away from him when defendant shot him. Testimony from other witnesses confirmed that defendant shot Collins from close range. Collins demonstrated to the jury how he was holding the phone in his right hand with his arm somewhat extended, but still parallel with and close to his head. The phone was not magically floating in the air or propped up against something when defendant fired the revolver. There was no evidence presented at trial showing that defendant was unaware that Collins was holding the cell phone at the time he cocked the hammer and pulled the trigger. Multiple witnesses testified that defendant stated that he was going to shoot through the phone and, logically, it follows that, when a person shoots *through* something, whatever is on the other side is also likely to sustain damage from the bullet, in this case, Collins's hand. Defendant's contention that he intended to shoot the phone and not Collins, thereby deserving a lesser-included offense instruction for reckless conduct, is disingenuous considering the record.

¶ 69    While defendant additionally contends that his intoxication at the time of the shooting is evidence of a reckless mental state rather than a knowledgeable mental state, voluntary intoxication is generally not a defense that can be used to mitigate a criminal defendant's culpability for crimes that do not require specific intent. See *People v. Redmond*, 265 Ill. App. 3d 292, 302 (1994). Defendant did not assert intoxication as an affirmative defense. Moreover, none of the witnesses at trial testified that defendant was visibly intoxicated. None of the witnesses

testified that defendant slurred his speech or had an unsteady gait the night of the incident. Furthermore, the record shows that immediately after the incident, defendant provided specific instructions to hide the evidence of what had occurred, which shows that he had maintained his mental faculties. In addition, after shooting the victim, defendant immediately pointed the gun towards the ceiling, indicating that he understood the dangerousness of the weapon and of his conduct.

¶ 70    Finally, defendant's reliance on *Williams* and *People v. Upton*, 230 Ill. App. 3d 365 (1992) is misplaced because the evidence in this case regarding defendant's mental state was not conflicting. *Upton* is distinguishable, as there, the defendant was running after and shooting towards a tow truck carrying two men tasked with repossessing the defendant's car. 230 Ill. App. 3d at 366-71. A cascade of trial errors in *Upton* prevented proper presentation of evidence establishing the defendant's state of mind at the time he fired his gun (*id*. at 373-76), whereas in this case, the evidence clearly demonstrated defendant's purposeful intention to discharge his revolver at Collins. The defendant in *Williams* was entitled to a reckless conduct lesser-included offense jury instruction for the charged offense of ADF due to there being some evidence in the record from which a jury could have found the defendant guilty of the lesser offense but acquit on the greater offense. While there were witnesses at the scene of the incident in *Williams*, each had a different version of events, and no one disputed the defendant's claim that he fired the gun into the air with his eyes closed.

¶ 71    Here, however, the trial court determined that the evidence presented at trial was indicative only of a knowing mental state on the part of defendant. According to the court, there was no evidence introduced at trial from which a jury could find defendant guilty of reckless conduct but acquit him of ABF and ADF. Multiple witnesses maintained similar stories of the event which

indicated that defendant acted knowingly in firing his gun. There is significant evidence, discussed in detail above, that defendant intended to shoot through the phone and knew Collins was holding it. Therefore, the trial court did not abuse its discretion in refusing defendant's proposed reckless conduct jury instructions as a lesser-included offense for ABF and ADF. *Matias*, 2023 IL App (2d) 220445-U, ¶ 42.

¶ 72    Finally, in his reply brief, defendant argues for the first time that the State offered the submission of improperly drafted jury instructions at trial for ABF. The tendered jury instruction in this case mirrored the language contained in IPI 11.24, which provides that, to sustain the charge of ABF, the State must prove "[t]hat the defendant [knowingly] caused injury to another person." Illinois Pattern Jury Instructions, Criminal, No. 11.24 (approved Apr. 26, 2016). Defendant contends that because the State offered this instruction in the lower court, it is now estopped from taking a contrary position in this court. In short, defendant essentially argues that the State is prohibited from challenging the differences in the legal standard for the mental state provided in section 12-3.05(e)(1) of the Code and IPI 11.24. Points not argued in the opening brief are forfeited and may not be raised for the first time in the reply brief. See *People v. McDaniel*, 2012 IL App (2d) 190496, ¶ 60 (citing Ill. S. Ct. R. 341(h)(7) (Oct. 1, 2020)).

¶ 73    Forfeiture aside, we reject defendant's argument. Section 4-3(b) of the Code provides that, "[i]f the statute defining an offense prescribed a particular mental state with respect to the offense as a whole, without distinguishing among the elements thereof, the prescribed mental state applies to such an element." 720 ILCS 5/4-3(b) (West 2020). Thus, the "knowingly" requirement of Code section 12-3.05(e) applies equally under section 4-3(b) such that, an offender who commits aggravated battery must both knowingly discharge a firearm and knowingly cause injury to another person. 720 ILCS 5/3.05(e)(1) (West 2020). Accordingly, when the jury convicted defendant of

ABF, they concluded that, not only did defendant knowingly fire the revolver, but he knowingly caused injury to Collins, in line with IPI 11.24 and section 12-3.05(e)(1). In short, the jury found that defendant had the mental state to both fire a gun and injure Collins. Defendant's argument on this issue does nothing to further his defense and instead strengthens the jury's verdict on the charge of ABF. We find the trial court properly rejected the lesser-included offense jury instruction for reckless conduct.

¶ 74                                    B. Prosecutorial Misconduct

¶ 75     Next, defendant argues that the State committed prosecutorial misconduct by repeatedly using his status as a felon as evidence of his dangerousness, as well as including pervasive attempts to generate sympathy for the victim. Particularly, defendant points to comments in opening statement and closing argument, during which the State told the jury, "[t]here's nothing more dangerous than a firearm in the hands of a convicted felon," and that "[f]irearms and felons" are "a dangerous combination." The State also repeated defendant's convicted felon status multiple times during rebuttal argument. Defendant also challenges statements that he argues evoked sympathy for Collins, including, among other things, when the State told the jury in opening statement that Collins "lost his right index finder when the bullet pierced through the phone and pierced through Zane Collins' [*sic*] hand, thereby causing him to be disabled and disfigured for the rest of his life." He also points to a line of questioning of Collins during direct examination asking, among other things, to describe whether he was sad, scarred permanently on his hand, and able to work at his former place of employment. Finally, defendant argues that the State improperly attempted to create sympathy for Collins on multiple occasions during closing argument and rebuttal, for example, when the State told the jury, "[b]ull's-eye [*sic*] straight through the phone, straight through his finger, dangling like a hot dog with a little bit of casing holding it together,

nearly decapitated a limb."

¶ 76    In setting forth this argument, defendant acknowledges that he did not properly preserve this issue, as his counsel did not object to the comments during trial, and this issue was not raised in a posttrial motion. See *People v. Woods*, 214 Ill. 2d 455, 470 (2005) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)) ("Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review."). Failure to object timely at trial or raise the issue in a posttrial motion results in forfeiture of the argument. *Id*. See also *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 320-21 n.2 (2008) ("While waiver is the voluntary relinquishment of a known right, forfeiture is the failure to timely comply with procedural requirements," which apply equally to criminal and civil matters). Nevertheless, defendant maintains that we may review this issue under either prong of the plain-error doctrine.

¶ 77    The State responds that neither prong of the plain-error doctrine applies, as the challenged remarks were based on properly admitted evidence of defendant's felon status and Collins's resulting bodily harm, both of which the State was required to prove for the offenses charged. The State further argues that defendant stipulated to his felon status for the charge of UUWF. According to the State, evidence and inferences therefrom can be argued, even when unfavorable to defendant. The State maintains that, if any error occurred, it was not so serious that it affected the jury's verdict.

¶ 78    Supreme Court Rule 615(a) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain error rule "allows a reviewing court to consider

unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). However, the plain error rule "is not 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Rather, it is a narrow and limited exception to forfeiture principles designed to protect the defendant's rights and the reputation of the judicial process. *Herron*, 215 Ill. 2d at 177.

¶ 79    Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). The first step in plain error review is to determine whether error occurred at all. *Piatkowski*, 225 Ill. 2d at 565.

¶ 80                                    1. Opening Statement

¶ 81    While the State has wide latitude in making opening statements and closing arguments and is entitled to comment on the evidence (*People v. Pasch*, 152 Ill. 2d 133, 184 (1992)), comments intending only to arouse the prejudice and passion of the jury are improper (*People v. Herndon*, 2015 IL App (1st) 123375, ¶ 36). In particular, this court has often disapproved the use of derogatory and pejorative terms used to described the defendant. See, *e.g.*, *People v. Johnson*, 119 Ill. 2d 119, 139-40 (1987) (improper to characterize the defendant as an "animal" during closing argument even when characterization was based on evidence); *People v. Deloney*, 359 Ill. App. 3d 458, 469 (2005) (criticizing the State's use of pejorative terms ("crack-head") to describe the

defendant during opening and closing, but finding it did not rise to the level of reversible error); *People v. Flax*, 255 Ill. App. 3d 103, 111 (1993) (noting that characterizing the defendant in a "derogatory manner where such characterization is intended to inflame the passions of the jury or arouse the jury's prejudice against the defendant" may be improper, but finding that "bad man" descriptor in closing was "relatively mild pejorative").

¶ 82    Notably, this court has implied that the wide latitude to which attorneys are entitled in closing arguments may not necessarily apply to opening statements. Specifically, this court has observed that the purpose of an opening statement is "to advise the jury concerning the question of facts and it is not and should not be permitted to become an argument." *People v. Weller*, 123 Ill. App. 2d 421, 427 (1970). Moreover, the statement should be "brief and general" and "free from material that may tend to improperly prejudice the accused in the eyes of the jury." *Id*. In other words, remarks that may be appropriate for closing argument may not be appropriate for opening statements. However, "[a]n opening statement may include a discussion of the evidence and matters that may reasonably be inferred from the evidence." *People v. Arroyo*, 339 Ill. App. 3d 137, 149 (2003) (citing *People v. Smith*, 141 Ill. 2d 40, 63 (1990)). "Reversible error occurs only where the remarks, referring to evidence that later proves to be inadmissible, are attributable to the deliberate misconduct of the prosecutor and result in substantial prejudice to the defendant." *Id*. (citing *People v. Kliner*, 185 Ill. 2d 81, 127 (1998)).

¶ 83    Turning to the State's comments during opening statement that "the defendant is a convicted felon" and that "[t]here's nothing more dangerous than a firearm in the hands of a convicted felon," we find these comments did not rise to the level of reversible error. Defendant stipulated that he was a convicted felon and he used a firearm that he was not supposed to have to shoot Collins. Indeed, during opening statement, counsel for defendant conceded that defendant

was a convicted felon, should not have had the firearm, and should be found guilty of UUWF. None of what the State commented upon during its opening statement regarding defendant's status as a felon later proved to be inadmissible. We likewise find no reversible error regarding comments related to Collins because none were inadmissible and instead reflected Collins's injured condition and his reaction to being shot. The State was required to prove defendant committed bodily harm to Collins as an element of ABF. The State's opening statement delineated what later would be evidence of bodily harm. In sum, we find no error during the State's opening statement.

¶ 84                    2. Direct Examination of Collins

¶ 85    During the direct examination of Collins, the State asked him if defendant had followed up with him to see if he was okay. The State also elicited testimony from Collins that losing his finger made him sad and that he had suffered scars and disfiguration from the incident. Collins stated that he suffers from pain in his right hand every day, cannot write, and is unable to perform the work that he used to prior to the incident. The State continued to question Collins regarding what jobs he was able to perform after the loss of his right index finger and how the shooting affected him. Defendant argues that this line of questioning constituted prosecutorial misconduct.

¶ 86    Although the State's elicitation of this testimony arguably was an attempt to engender sympathy for Collins, the record does not demonstrate the verdict was based on this line of questioning. Indeed, as we noted above, the jury not only convicted defendant of ABF when it found defendant knowingly fired a gun, the jury also specifically found defendant knowingly caused injury to Collins. Regardless of any sympathy for Collins, the jury could and apparently did believe Collins's testimony regarding the bodily injury defendant had inflicted upon him, which was a necessary element to establish ABF. The jury could and did consider additional evidence, including testimony of other witnesses reacting to the shooting and photographic

evidence of Collins's hand following the shooting, which bolstered their verdict. For example, Lauderdale testified that after Collins was shot, she observed his finger "basically dangling by the skin." The jury was entitled to believe the testimony of Collins and other witnesses who observed the shooting. We find that this was evidence of the injury, which is an element of the offense, in that it shows the extent of the injury. Moreover, given the evidence of defendant's guilt, we do not believe that the State's alleged attempt to evoke sympathy for Collins during his direct examination would constitute "a material factor in the conviction or cause[d] substantial prejudice" to defendant. *People v. Smith*, 362 Ill. App. 3d 1062, 1085 (2005) (citing *People v. Robinson*, 157 Ill. 2d 68, 84 (1993)). In other words, even if the State had not elicited the challenged testimony, the jury could quite readily have reached the same verdict on the relevant evidence presented by the State. We do not find that the State's conduct when questioning Collins on direct examination was improper.

¶ 87                                3. Closing Argument

¶ 88    Defendant argues that the State committed prosecutorial misconduct when it made prejudicial comments regarding his status as a convicted felon and again by attempting to evoke sympathy for Collins during closing argument and rebuttal. The very first line of the State's closing argument provided, "Firearms and felons. It's a dangerous combination, it's an illegal combination, and that combination on December 17, 2020, sent Zane Collins to the hospital." During rebuttal argument, the State repeated that "there is nothing more dangerous than a felon with a gun." The jury also heard during rebuttal, "I think we should ask ourselves, I think it's very interesting and you want to ask yourself what's a convicted felon doing when it was time to leave the apartment after the shooting." In short, defendant contends the State improperly emphasized defendant's convicted felon status to the jury. Further, defendant argues that the State made

improper comments to evoke sympathy for Collins during closing argument and rebuttal. For example, the State argued that Collins testified "he never heard the defendant say sorry for that, that the defendant didn't feel sorry enough to help him get a bandage or anything for his finger." In rebuttal, the State argued that defendant was "sleeping peacefully" at Collins's apartment while Collins was in pain at the hospital, losing a finger. The State asked the jury, "Is that justice?"

¶ 89    The State is afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. See *People v. Nieves*, 193 Ill. 2d 513, 533 (2000) (prosecutorial comments "constitute reversible error only when they engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from those comments"). Substantial prejudice occurs if the improper remarks constituted a material factor in the defendant's conviction. *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 48. The State may properly comment on the evidence presented and reasonable inferences drawn therefrom, respond to comments made by defense counsel that invite a response, and comment on the credibility of witnesses. *Id*. ¶ 47. It is improper for a prosecutor to misstate the evidence or argue facts not in evidence. *Id*. "In reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety, and remarks must be viewed in context." *People v. Moody*, 2016 IL App (1st) 130071, ¶ 60 (citing *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994)). "Reviewing courts will consider the closing argument as a whole, rather than focusing on select phrases or remarks." *People v. Perry*, 224 Ill. 2d 312, 347 (2007).

¶ 90    Furthermore, closing arguments cannot be used to simply inflame the passions of the jury or develop the prejudices of the jury without casting any light upon the issues. *People v. Wheeler*, 226 Ill. 2d 92, 128-29 (2007). The State may dwell upon the evil results of the crime and urge the

fearless administration of the law (*People v. James*, 2021 IL App (1st) 180509, ¶ 41), but it may not, however, "utilize closing argument to forge an 'us-versus-them' mentality that is inconsistent with the criminal trial principle that a jury fulfills a nonpartisan role, under the presumption that a defendant is innocent until proven guilty" (*Wheeler*, 226 Ill. 2d at 129). Limited exhortations by the State are proper when it is made clear to the jury that its ability to affect general and specific deterrence is dependent solely upon the jury's careful consideration of the specific facts and issues before it. *People v. Johnson*, 208 Ill. 2d 53, 79 (2003). The State, however, may not blur that distinction with an extended and general denunciation of society's ills and, in effect, challenge the jury to send a message through their verdict. *Id*.

¶ 91 Here, after reviewing the complained-of comments regarding defendant's status as a convicted felon in the context of both the State's and defendant's closing arguments, we find no error. Similar to opening statement, defendant conceded during closing argument that the State had no difficulty proving him guilty of UUWF. Instead, defendant focused his argument on whether he knowingly discharged the firearm. Defendant also argued that he had no consciousness of guilt because he stayed in Collins's apartment after the shooting and did not flee.

¶ 92 The State mentioned defendant's convicted felon status six times during closing argument and rebuttal, including when discussing the elements of UUWF. The State's comments regarding defendant's convicted felon status did not rise to the level of substantial prejudice to defendant and did not deprive him of a fair trial. Here, defendant's status as a convicted felon was a comment on the evidence and defendant portrayed it out of context in this appeal. The State described how defendant had been carelessly handling the revolver earlier in the evening, before the shooting, which needed to be contrasted with his deliberate firing of the gun at the time of the shooting. The State mentioned at that point during closing argument that the parties had stipulated to the fact that

defendant was a convicted felon. We agree with the State that there is nothing inherently prejudicial in the prosecution pointing out that defendant was not supposed to possess a weapon because he was a convicted felon, for purposes of establishing the elements of UUWF.

¶ 93    Turning to defendant's contention that the State attempted to create sympathy for Collins during closing argument and rebuttal, we look at the arguments in their entirety and view challenged remarks in context. *Wheeler*, 226 Ill. 2d at 122. The State may argue legitimate inferences derived from the evidence (*People v. Nicholas*, 218 Ill. 2d 104, 121 (2005)) and may also respond to comments made by defense counsel (*People v. McGee*, 2015 IL App (1st) 130367, ¶ 56). Furthermore, "a prosecutor may comment unfavorably on the evil effects of the crime and urge the jury to administer the law without fear, when such argument is based upon competent and pertinent evidence." *Nicholas*, 218 Ill. 2d at 121-22. Even if the State's comments exceeded the bounds of proper comment, we still would not disturb the jury's verdict unless the remarks resulted in substantial prejudice. *People v. Barnes*, 117 Ill. App. 3d 965, 976 (1983). Substantial prejudice results only if the improper remarks constitute a material factor in the defendant's conviction. *Wheeler*, 266 Ill. 2d at 123.

¶ 94    In this case, we have reviewed the challenged comments regarding Collins from closing argument and rebuttal. We cannot say that the State exceeded the wide latitude it is accorded. Each of the comments was based on the evidence presented at trial or was presented as a legitimate inference derived from the evidence. Defendant argues the comments without context. For example, immediately before the State argued, "[b]ull's-eye straight through the phone, straight through [Collins's] finger, dangling like a hotdog with a bit of casing holding it together," the State discussed the photographs admitted into evidence depicting what the cell phone and Collins's finger looked like following the shooting. The State followed this allegedly inflammatory

comment with Lauderdale's testimony regarding what she saw that night. The State was required to establish that defendant caused injury to Collins to prove ABF and its argument stemmed from the evidence presented to the jury.

¶ 95    Moreover, the State's repeated requests for justice were merely statements commenting unfavorably on the evil effects of the crime and a call for the jury to administer the law without fear, when such argument was based upon competent and pertinent evidence. *Nicholas*, 218 Ill. 2d at 121-22. Indeed, the State argued that the jury should render guilty verdicts "to deliver justice for Zane Collins because the defendant committed all of these offenses and we have proven it beyond a reasonable doubt." There is simply nothing inflammatory about the State asking the jury for a guilty finding after arguing all the elements of the offenses were established in an effort to hold defendant accountable for his actions. In sum, the State did not commit error in its comments during closing argument and the plain error doctrine is inapplicable to defendant's forfeited claims. *Herron*, 215 Ill. 2d at 187.

¶ 96    Since we have held that none of these errors were either reversible or resulted in prejudice, defendant's alternate claim of ineffective assistance of counsel also necessarily fails. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010); see also *People v. White*, 2011 IL 109689, ¶ 134 (finding that the evidence against the defendant demonstrated that he could not show prejudice for purposes of establishing either plain error or ineffective assistance of counsel).

¶ 97    Finally, defendant argues that, while each cited comment may not, in and of itself, warrant reversal, the cumulative effect of them demonstrates sufficient prejudice so as to have denied him his right to a fair trial. We do not agree. We have thoroughly examined the record, considered each of these cited instances at length, and have found none of them amount to error at all. Accordingly,

as each instance is not error, their cumulative effect cannot rise to the level of reversible error either. *People v. Perry*, 224 Ill. 2d 312, 356 (2007).

¶ 98                                                    C. Sentencing

¶ 99    Finally, defendant argues that the 10-year sentence imposed for his ABF and ADF convictions was excessive. Defendant specifically pointed to the trial court's finding that there were no applicable statutory factors in mitigation. He contends that this finding demonstrates the court failed to consider his demonstrated rehabilitation. He notes that the instant offenses stemmed from alcohol abuse and that, once he was released on bond, he had maintained his sobriety for almost two years, including passing 89 drug tests before sentencing. He argues that the demonstrative changes he made in his life warranted a shorter sentence.

¶ 100   The Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In imposing a sentence, the trial court must balance relevant factors, such as the nature of the offense, the protection of the public, and the defendant's rehabilitative potential. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). The court has a superior opportunity to evaluate and weigh a defendant's credibility, demeanor, character, mental capacity, criminal history, social environment, and habits, as well as the nature and circumstances of the crime and of the defendant's conduct in the commission of it. *Id.* In addition, a court is not required to expressly outline its reasoning for sentencing, and absent some affirmative indication to the contrary (other than the sentence itself), we must presume that the court considered all mitigating factors on the record. *People v. Perkins*, 408 Ill. App. 3d 752, 762-63 (2011). Since the most important sentencing factor is the seriousness of the offense, the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, and the presence of

mitigating factors neither requires a minimum sentence nor precludes a maximum sentence. *Alexander*, 239 Ill. 2d at 214.

¶ 101    We review a sentence within statutory limits for an abuse of discretion, and we may only alter a sentence when it varies greatly from the spirit and purpose of the law, or if it is manifestly disproportionate to the nature of the offense. *Id.* at 212. So long as the trial court does not ignore pertinent mitigating factors or consider either incompetent evidence or improper aggravating factors, it has wide latitude in sentencing a defendant to any term within the applicable statutory range. *Perkins*, 408 Ill. App. 3d at 762-63. This broad latitude means that this court cannot substitute its judgment simply because it might have weighed the sentencing factors differently. *Alexander*, 239 Ill. 2d at 212-13.

¶ 102    After reviewing the record, we conclude that the trial court did not abuse its discretion when it sentenced defendant to 10 years' imprisonment for the merged ABF and ADF convictions. The offense of ABF is a Class X felony, which has a statutorily mandated sentencing range of 6 to 30 years' imprisonment. 720 ILCS 5/12-3.05(e)(1), (h) (West 2020); 730 ILCS 5/5-4.5-25 (West 2020). The State changed the sentencing parameters of the charge of ADF to a Class 1 felony, which carries a sentencing range of 4 to 15 years' imprisonment.720 ILCS 5/24-1.2(a)(2), (b) (West 2020); 730 ILCS 5/5-4.5-30(a) (West 2020). Because defendant's merged 10-year sentence fell within the applicable sentencing ranges, we presume the sentence is proper. *People v. Charleston*, 2018 IL App (1st) 161323, ¶¶ 16-17 (finding no abuse of discretion where the trial court's sentence was not "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense"). This presumption will be rebutted only if defendant makes an affirmative showing that the sentence greatly departs from the spirit and purpose of the

law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). Defendant has failed to make such a showing.

¶ 103   Nevertheless, defendant argues the trial court failed to consider the factors in mitigation and significant rehabilitation of his life prior to sentencing. Defendant essentially invites this court to reweigh the evidence in aggravation and mitigation and substitute our judgment for that of the trial court. We decline to do so. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Moreover, the record belies defendant's argument that the trial court failed to consider the evidence in mitigation to which he points on appeal. There exists a presumption that the court considered all mitigating factors supported by the record absent some affirmative indication, other than the sentence itself, to the contrary. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. The court "need not detail precisely for the record the exact thought process undertaken to arrive at the ultimate sentencing decision or articulate its consideration of mitigating factors." *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 32.

¶ 104   Here, the record shows that all the mitigating evidence on which defendant relies was before the trial court in a lengthy and detailed presentencing report and was extensively argued by defense counsel at sentencing. When announcing the sentence, the court noted it had considered all the factors in aggravation and found no statutory factors in mitigation, which shows that the court did, in fact, review and consider whether there were any existing statutory factors in mitigation. Indeed, the court specifically stated, "[a]s to the statutory factors in mitigation that shall be afforded weight in favor of withholding or minimizing a sentence, the Court finds that there are no applicable statutory factors in mitigation." Furthermore, defendant again argued during his motion to reconsider sentence that the court failed to consider the factors in mitigation. In denying defendant's motion, the court stated that it had previously considered everything argued before the

court during the original sentencing hearing and found that the sentence imposed was reasonable "given the length of time [defendant] was on this Court's probation for literally years, and [defendant received] credit for his good behavior while under the Court's supervision on an order of electronic home monitoring."

¶ 105   The seriousness of the offense is the most important sentencing factor. *Alexander*, 239 Ill. 2d at 214. The trial court is not required to give greater weight to the mitigating factors than to the seriousness of the offense. *Id*. We find the court adequately weighed the evidence in aggravation and mitigation and fashioned a sentence that was appropriate under the circumstances, particularly in light of the seriousness of the offense. We therefore find that defendant has failed to establish that his sentence was greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Id*. at 212. We find no abuse of discretion and affirm the court's judgment as to sentencing.

¶ 106                                III. CONCLUSION

¶ 107   For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 108   Affirmed.